# United States District Court

### For The District of South Carolina
### (Florence Division)

RECEIVED
USDC CLERK, FLORENCE, SC
2013 OCT 28 PM 3: 40

| | |
|---|---|
| **BARBARA A. GIBBS; MELVIN E. GIBBS-SQUIRES,** and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> **BANK OF AMERICA, N.A.; NATIONSTAR MORTGAGE; SPECIALIZED LOAN SERVICING d/b/a SLS; URBAN SETTLEMENT SERVICES d/b/a/ URBAN LENDING SOLUTIONS; and DOES, 1-5,** <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) **CIVIL ACTION NO.** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) **Demand for Jury Trial** <br> ) <br> ) <br> ) <br> ) |

## COMPLAINT

JURISDICTION AND VENUE

I.     Venue, is proper because Plaintiffs and the primary property is located in this district, the defendants do business in this district, and a substantial part of the events giving rise to plaintiffs' claims occurred in this district; AND, *see infra: p.5.*

II.     Jurisdiction of this Court is invoked pursuant the laws of the State of South Carolina; and Title IX of the Organized Crime Control Act of 1970 (RICO), Racketeering and Influence Corrupt Organization (RICO), 18 U.S.C. §§ 1961-1968.

III.     This action seeks money damages and equitable relief, and is brought under the common law, federal laws and the laws of the State of South Carolina, negligence and racketeering.

~ 1 ~

## I. INTRODUCTION

1.     In early 2009, Bank of America ("BOA") took more than $45 billion in Government bailout money. As a condition of receiving this bailout, BOA agreed to participate in the Home Affordable Modification Program ("HAMP") – a detailed program designed to stem the foreclosure crisis by providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers. BOA signed a contract with the U.S. Treasury on April 17, 2009 agreeing to comply with the HAMP requirements and to perform loan modification and other foreclosure prevention services described in the program guidelines.

2.     Though BOA accepted billions of dollars and contractually agreed to comply with the HAMP directives and extend loan modifications to eligible homeowners, BOA has systematically and deliberately worked to sabotage HAMP and to modify as few mortgages as possible according to its terms. BOA found it was more profitable if homeowners accepted in-house modifications rather than the loan modifications mandated by the HAMP process. Consequently, BOA pushed homeowners who were applying for HAMP modifications toward more expensive in-house modifications and/or refused to provide modification applications using tactics of outright fraud.

3.     Rather than working diligently to reduce the number of loans in danger of default by establishing permanent modifications, BOA serially strung out, delayed, and otherwise hindered the modification processes that it agreed to facilitate. BOA's delay and obstruction tactics have taken various forms with the common result that homeowners with loans BOA serviced, and who met the requirements for participation in HAMP, did not get a fair opportunity to secure a permanent loan modification through the HAMP process.

~ 2 ~

4.      To accomplish its objectives, BOA created a widespread RICO enterprise to defraud homeowners who sought modifications and then acted as the kingpin of that enterprise. BOA enlisted Defendants SLS, Nationstar Mortgage, and Urban Settlement Services (d/b/a Urban Lending Solutions, referred to hereinafter as "Urban") to act as a member of the RICO enterprise and assigned to Urban key aspects of the process of administering HAMP, including interacting with homeowners seeking HAMP modifications, collecting and processing documents from homeowners, and corresponding with homeowners. BOA enlisted Defendant Specialized Loan Servicing (d/b/a SLS, referred to hereinafter as "SLS") to act as a member of the RICO enterprise and assigned to Urban key aspects of conspiracy, including acquiring mortgages of HAMP applicants, foreclosing on HAMP applicants, collecting and processing documents from homeowners, and corresponding with homeowners. BOA, Urban, SLS and [Does] not known to Plaintiffs, worked in concert, under BOA's direction for many years, to frustrate the HAMP process and to prevent as many homeowners as possible from obtaining permanent loan modifications that complied with HAMP while allowing BOA to maintain the appearance to regulators and the public of trying to comply with its HAMP obligations. Through this relationship and with this common goal, BOA, Urban, SLS and Does not know to Plaintiffs, formed an association-in-fact enterprise that was effectuated through the use of thousands of false wire and mail communications. As part of the scheme "site leaders" were told BOA would collect more money if HAMP modifications were delayed and, as such, BOA employees were instructed to delay HAMP modifications.

5.      As part of the loan-modification scheme and enterprise, homeowners seeking HAMP trial plans were directed by wire and mail instructions from BOA to send financial information directly to Urban or SLS. Consumers were led to believe that they were dealing with BOA when

secretly they were communicating with Urban, SLS, Nationstar or others. As part of the loan-modification scheme and enterprise, Urban, SLS and Nationstar became "black holes" for documents sent by homeowners. As part of the enterprise and scheme, BOA used the mail and wires to falsely deny modifications by claiming that information required of homeowners seeking a HAMP modification had not been received, when in fact BOA, Urban and SLS had received the documents. Oftentimes consumers were led to believe they were speaking with BOA's "Office of the President" when in fact they were speaking with Urban or SLS employees. As part of the scheme Urban and SLS employees manipulated financial records to justify ending the HAMP modifications process for homeowners.

6.     Numerous former employees of both BOA and Urban report that BOA directed its employees and contractors to use the wires and mails to deliberately lie to homeowners who were in the process of trying to obtain loan modifications under HAMP. They further report a widespread and deliberate practice of knowingly issuing false notices claiming that homeowners had failed to submit required documentation and of denying HAMP applications en masse for reasons they knew to be false. These actions were taken with the full knowledge, and at the direction, of the individuals tasked with running Defendants' HAMP modification program.

7.     This scheme was conducted via interstate mail and phone lines, in thousands of documents sent via mail and overnight courier, including documents and phone calls intended to deceive borrowers into believing they would receive HAMP modifications, and letters and phone calls which were knowingly false about why borrowers were not receiving HAMP modifications. Because of the BOA, Urban, SLS and Does not known to Plaintiffs, hundreds of thousands of homeowners were wrongfully being deprived of an opportunity to cure their delinquencies, pay their

~ 4 ~

mortgage loans and save their homes. By failing to live up to its obligations under the terms of the agreement it entered into with the Department of the Treasury, and the terms of the contracts it formed with individual homeowners, BOA has left thousands of borrowers in a state of limbo – often worse off than they were before they sought a modification from BOA.

8.      On behalf of nationwide classes of borrowers, Plaintiffs state a cause of action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) & (d), alleging that Defendants created an association-in-fact enterprise designed to mislead and deceive borrowers through use of the United States mail and wires. On behalf of the members of those classes, Plaintiffs seek declaratory relief and/or a judgment of liability.

9.      In addition, on behalf themselves and statewide classes of similarly situated borrowers, Plaintiffs state claims of promissory estoppel for representations made to them by Defendants.

## II.    JURISDICTION AND VENUE

10.     This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d) in that these complaints are putative class actions in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are thousands of members in the proposed class and at least one member of the class of plaintiffs is a citizen of a state different from any defendant. BOA is, on information and belief, a citizen of North Carolina. Urban is a citizen of Pennsylvania with its main offices in Colorado. Specialized Loan Servicing (a/k/a The Terwin Group) is, on information and belief, a citizen of Colorado. Plaintiffs are citizens of South Carolina, Maryland and California.

11.     This Court also has original federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), a substantial part of property that is the subject of the action is situated in this District and because Defendants otherwise transact substantial business in this district.

## III. PARTIES

13.     Individual and Representative Plaintiff Barbara A. Gibbs is a resident of the state of Maryland.

14.     Individual and Representative Plaintiff Melvin E. Gibbs and Barbara A. Gibbs are husband and wife and Melvin is a resident of the state of South Carolina.

15.     Defendant Bank of America, N.A., is a mortgage lender with headquarters at 101 Tryon Street, Charlotte, North Carolina 28255. Bank of America, N.A., performs substantial business within the state of South Carolina. Bank of America N.A. has formerly done business under the name BAC Home Loans Servicing, LP, which was formerly a subsidiary of Bank of America, N.A. and is now a successor by merger.

16.     Defendant Urban Settlement Services d/b/a Urban Lending Solutions is a limited liability corporation organized under the laws of Pennsylvania with main offices located in Broomfield, CO and which does business throughout the United States.

17.     Defendant Nationstar Mortgage is a limited liability corporation organized under the laws of Texas.

~ 6 ~

18.     Defendant Specialized Loan Servicing d/b/a SLS is a limited liability corporation organized under the laws of Colorado: foreign corporate filings in the States of California, Florida and Texas; with main offices located in Highlands Ranch, CO and which does business throughout the United States.

19.     At all times herein mentioned, Defendants Bank of America, N.A., and BAC Home Loans Servicing, LP, both individually and collectively, are and were agents and/or joint ventures of each other and, in doing the acts alleged herein, were acting within the course and scope of such agency. Collectively, these Defendants combined and conspired with each "BOA" [Hereinafter (The HAMP-less Gang)].

## IV.     FACTUAL BACKGROUND

### A.     The Foreclosure Crisis

20.     The last fifteen years has been marked by the inflation and bursting of one of the largest asset bubbles in United States history.  After U.S. home prices increased by 132 percent from the first quarter of 1997 to the second quarter of 2006 (an average annual increase of 9.5 percent), U.S. home prices decreased by 35 percent from the second quarter of 2006 to the first quarter of 2012 (an average annual decrease of 7.1 percent).[1]  Over the same time period of the home price collapse, unemployment increased from 4.6 percent at the end of the second quarter of 2006 to 8.2 percent at the end of the first quarter of 2012.[2]

---

[1]     These measures are based on the S&P/Case-Shiller U.S. National Home Price Index (available at http://us.spindices.com/indices/real-estate/sp-case-shiller-us-national-home-price-index) (accessed Mar. 24, 2013).

[2]     U.S. Department of Labor, Bureau of Labor Statistics, Labor Force Statistics from the Current Population

21.     During the housing bubble, many mortgages were originated with features that made them vulnerable to default should the economy deteriorate in conjunction with decreasing home values. These loan features included prepayment penalties, and adjustable rate terms with low introductory "teaser" rates that resulted in significantly higher monthly payments once the rates reset.[3]

22.     Countrywide Home Loans was among the most aggressive companies in originating loans with these abusive features. With its purchase of Countrywide in 2008, BOA acquired hundreds of thousands of loans that were deceptively originated and that included features that made borrowers increasingly vulnerable to default.

23.     Once the bubble burst, foreclosures skyrocketed as economic conditions created difficulty for many borrowers in meeting their mortgage obligations (and borrowers with negative equity in their homes were less likely to continue making mortgage payments). Falling housing prices made it difficult for distressed homeowners to sell or refinance their houses.

24.     The Center for Responsible Lending estimates that 6.4 percent of all mortgages originated from 2004 to 2008 were already lost to foreclosure as of February 2011.[4]   Another 8.3 percent of all loan originations made from 2004 to 2008 were at least 60 days delinquent or in the

---

Survey, http://data.bls.gov/timeseries/LNS14000000 (accessed Mar. 24, 2013).

3 *See, e.g.*, Eric S. Belsky & Nela Richardson, *Understanding the Boom and Bust in Nonprime Mortgage Lending*, Working Paper, Joint Center for Housing Studies, Harvard University, at 38-40 (Sept. 2010); Kristopher S. Gerardi, Andreas Lehnert, Shane M. Sherland, & Paul S. Willen, *Making Sense of the Subprime Crisis*, Working Paper 2009-02, Federal Reserve Bank of Atlanta, at 78-84 (Feb. 2009).

4     Debbie Gruenstein Bocian, Wei Li, & Carolina Reid, Center for Responsible Lending, Lost Ground, 2011: Disparities   in   Mortgage   Lending   and   Foreclosures,   at   14   (Nov.   2011)   (available   at http://www.responsiblelending.org/mortgage-lending/research-analysis/Lost-Ground-2011.pdf).

foreclosure process as of February 2011.[5]

## B.     HAMP Was Created as a Clear, Streamlined Method for Borrowers to Modify Loans and Avoid Foreclosure

25.     In response to this foreclosure crisis, the federal government developed the Making Home Affordable ("MHA") program. HAMP was developed as a part of MHA to help keep homeowners in their homes by incentivizing mortgage servicers to modify the loan terms for borrowers who were delinquent or in danger of becoming delinquent on their loans.

26.     When President Obama announced HAMP on February 18, 2009, he described it as a plan to eliminate a "maze of rules and regulations" in which homeowners rarely find answers, and in which "your ability to restructure your loan depends on where you live, the company that owns or manages your loan, or even the agent who happens to answer the phone on the day that you call." The president announced that HAMP "establishes clear guidelines for the entire mortgage industry that will encourage lenders to modify mortgages on primary residences.... This will enable as many as 3 to 4 million homeowners to modify the terms of their mortgages to avoid foreclosure."

27.     The president described the shared responsibility under HAMP as follows:

> this will require both buyers and lenders to step up and do their part, to take on some responsibility. Lenders will need to lower interest rates and share in the costs of reducing monthly payments in order to prevent another wave of foreclosures. Borrowers will be required to make payments on time in return for this opportunity to reduce those payments. Borrowers will be required to make payments on time in return for this opportunity to reduce those payments.[6]

---

5 Id.
6     Remarks by the President on the Home Mortgage Crisis, February 18, 2009; available at http://www.whitehouse.gov/the-press-office/remarks-president-mortgage-crisis

28.    The HAMP program is administered by the U.S. Treasury Department ("Treasury"). All banks participating in the Troubled Asset Relief Program ("TARP") were required to participate in HAMP, while other banks could participate voluntarily.[7] BOA accepted over $45 billion in TARP bailout money.[8] BOA thus signed a "Servicer Participation Agreement" with Treasury to participate in HAMP at its outset in April 2009.[9] As with all participating servicers, BOA was required to solicit certain borrowers to apply for HAMP assistance.[10]

29.    HAMP was designed to enhance the incentives of mortgage loan investors and servicers to modify loan terms to lower monthly payments. By modifying the loan, investors (and servicers) would initially receive lower payment cash-flows than they would have received under the original mortgage contract, but the likelihood of the borrower defaulting on the loan would decrease and the costs of foreclosure to borrowers, investors, servicers, and to communities could be avoided.

---

7    FED. RESERVE BANK OF ATLANTA ECON. REV., No. 2, at 6 (2010).

8    Officer of the Special Inspector General for the Troubled Asset Relief Program, Initial Report to the Congress, Feb. 6, 2009, http://www.sigtarp.gov/Quarterly%20Report/SIGTARP_Initial_Report_to_the_Congress.pdf, at 70.

9    *Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement,* http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/housing/ **mha/Documents_Contracts_Agreements/093010bankofamericahomeloansSPA(incltransmittal)-r.pdf**; *Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement,* http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/housing/mha/Documents_Contracts_Agreements/Bank%20of%20America%20NA.pdf.

10    U.S. Department of Treasury, *Making Home Affordable, Supplemental Directive 10-02,* Mar. 24, 2010 ("SD 10-02"), at 2-3.

~ 10 ~

30.     Treasury's regular evaluations of HAMP performance demonstrate the significant benefits to borrowers who receive HAMP modifications. As of June 2010, Treasury reported that 100 percent of permanent modifications featured an interest rate reduction, 56 percent had term extensions, and 29 percent included principal forbearance.[11] The median monthly principal and interest payment was reduced 41 percent for modified loans, from $1,422 to $838.[12] By the end of 2012, Treasury reported that homeowners in permanent HAMP modifications for all servicers had saved an estimated $17.3 billion in monthly mortgage payments.[13] Borrowers receiving HAMP modifications also realized a lower likelihood of re-default than borrowers receiving other types of modifications.[14]

---

[11]     U.S. Department of Treasury, Making Home Affordable Program Servicer Performance Report through June 2010 (Aug. 6, 2010), at 3.

[12]     *Id.*

[13]     Relief Program: Four Year Retrospective Report, An Update on the Wind-Down of TARP (Mar.2013),http://www.treasury.gov/initiatives/financial-stability/reports/Documents/TARP%20Four%20Year%20Retrospective%20Report.pdf, at 21.

[14]     Office of the Comptroller of Currency, OCC Mortgage Metrics Report, Disclosure of National Bank and Federal Savings Association Mortgage Loan Data, Third Quarter 2012 (Dec. 2012), http://www.occ.gov/publications/publications-by-type/other-publications-reports/mortgage-metrics-2012/mortgage-metrics-q3-2012.pdf, at 39, 44. Following the HAMP modifications implemented between the third quarter of 2009 and the second quarter of 2012, 8.5 percent were either in the foreclosure process or had completed foreclosure at the end of September 2012, compared with 14.8 percent of non-HAMP modifications over the same time period. *Id.* at 44.

~ 11 ~

31.    Treasury requires Participating Servicers to evaluate all loans that are 60 or more days delinquent or appear to be in imminent default (as defined by the Program Documentation), to determine which loans meet the HAMP eligibility criteria. In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect HAMP modifications.

32.    Treasury requires Participating Servicers to evaluate all loans that are 60 or more days delinquent or appear to be in imminent default (as defined by the Program Documentation), to determine which loans meet the HAMP eligibility criteria. In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if the borrower is eligible for a HAMP modification.[15]

33.    The modification process consists of two stages. In the first stage, the servicer collects and evaluates information from the borrower and from its own records. If the borrower meets specific eligibility guidelines for a HAMP modification, the servicer is required to offer the borrower a Trial Period Plan.[16] As described in the Trial Period Plan itself, the servicer then has the three-month trial period to verify that initial information.[17]

---

15      SD 09-01 at 2-4.

16      See U.S. Department of Treasury, *Making Home Affordable, Supplemental Directive 09-01*, Apr. 6, 2009 ("SD 09-01"), at 2. For ease of reference, in this Complaint, "Trial Period Plan" generally refers to all trial-payment agreements or plans issued by BOA and Urban pursuant to HAMP.

17      *Id.* at 5-6.

34.    During this first stage of the HAMP modification, before offering the Trial Period Plan, the servicer must evaluate whether the borrower meets specific eligibility guidelines for a HAMP modification:[18]

> The home's first-lien mortgage must not have an unpaid principal balance exceeding $729,750 (with higher limits for multiple-unit properties);
>
> x  is currently 60+ days delinquent, default is "reasonably foreseeable," or the mortgage is in foreclosure;
>
> x  The borrower has submitted a Hardship Affidavit documenting a borrower's financial hardship; and
>
> x  The borrower's monthly payment, including principal, interest, taxes, and insurance ("PITI") prior to the modification, is greater than 31 percent of the borrower's monthly income.[19]

---

[18]    See U.S. Department of Treasury, *Making Home Affordable, Supplemental Directive 09-01*, Apr. 6, 2009 ("SD 09-01"), at 2.

[19]    Mortgage insurance premiums and payments related to second lien loans are not included in the monthly payment for this calculation. *Id.* at 6.

35.     After using available information provided by the borrower and drawn from its own files, the servicer determined if each of these threshold requirements is met. Further, using that same information, the servicer evaluated borrower's eligibility at this stage via the waterfall and NPV processes (described in more detail below). If, on the basis of that information, the homeowner qualified for a HAMP modification, through these processes, the servicer would then offer the homeowner a Trial Period Plan.[20] As described in the Trial Period Plan itself, the servicer then had the three-month trial period to verify that initial information.[21]

36.     If application of the steps in the Program Documentation yields terms that produce the target 31% monthly mortgage payment, the servicer must offer the borrower a Trial Period Plan Agreement if the modification provides a net present benefit to the mortgage holder. This determination is known as the "Net Present Value" or ("NPV") test and is to be performed prior to the tender of a Trial Period Plan Agreement.

37.     If the homeowner complies with the Trial Period Plan's written requirements (including making all monthly Trial Period Plan payments), and the servicer's verification process revealed no variations in the verified information outside of HAMP parameters, then the second stage of the HAMP process is triggered, requiring an offer of a permanent modification.

---

20      SD 09-01, at 5, 17-18
21      *Id.* at 5-6

38.     Servicers are restricted from initiating foreclosure or continuing previously initiated foreclosure processes against any properties with loans that are eligible for HAMP but (i) have not been evaluated, (ii) are in the evaluation process, or (iii) are in an active Trial Period Plan.[22] The servicer must also coordinate with the mortgage insurer on the HAMP modification process for loans with mortgage insurance.[23]

39.     At the outset of HAMP in 2009, BOA used a standard form agreement to offer Trial Period Plans to eligible homeowners. This agreement describes the homeowner's duties and obligations under the plan and promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements. This Trial Period Plan was intended to, and did, induce homeowners to make trial payments and to expect that they would receive a permanent modification once they made all trial payments on time. However, as described at length below, pursuant to their loan- modification scheme and enterprise, BOA and Urban intended to deny modifications to the vast majority of borrowers even if they complied with all the requirements set forth in the Trial Period Plans.

40.     In March 2010, Treasury revised the process by requiring servicers to verify all financial information before issuing a Trial Period Plan to a borrower seeking a HAMP modification. Though BOA had required homeowners to submit financial documents before receiving a trial-payment agreement from the outset, BOA took this opportunity to revise its formal policies and to revise the form Trial Period Plan it used going forward. In response to several court decisions that

---

22     *Id.* at 14; U.S. Department of Treasury, *Making Home Affordable Program Handbook for Servicers of Non-GSE Mortgages, Version 4.1* (Dec. 13, 2012), **https://www.hmpadmin.com/portal/programs/** docs/hamp_servicer/mhahandbook_41.pdf ("HAMP Handbook v4.1"), at 86-88.

23     Id. at 14.

found the form Trial Period Plan that BOA used constituted a contract, in approximately July 2010, BOA began using a form Trial Period Plan that included more conditional language. Nevertheless, the form Trial Period Plan used after July 2010 was intended to, and did, induce homeowners to make trial payments and to expect that they would receive a permanent modification once they made all trial payments on time. However, as described at length below, pursuant to their loan-modification scheme and enterprise, BOA and Urban intended to deny modifications to the vast majority of borrowers even if they complied with all the requirements set forth in the Trial Period Plans.

41.     The goal for a HAMP modification is to reduce borrower's total payment (including principal, interest, taxes, insurance, and association fees) to 31 percent of their current income for a five-year period.[24] To determine the loan modification and associated incentives that must be offered under HAMP to achieve this goal, participating servicers must use a "waterfall" procedure to determine the loan terms for the potential final modification. Specifically, the standard waterfall procedure works as follows:[25]

- *Interest Reduction*: First, reduce the interest rate in 0.125 percent increments as needed (to a rate no lower than two percent) by re-amortizing the remaining life of the loan.[26]

---

24     **Error! Main Document Only.**SD 09-01, at 8-9.
25     **Error! Main Document Only.***Id.* at 9-10.
26     **Error! Main Document Only.**The outstanding balance includes arrearages such as past due interest, out of pocket and pending escrow payments, and servicing fees that are not related to the modification. *Id.* at 9; HAMP Handbook v4.1, at 104. Late fees may not be capitalized and must be waived if the borrower satisfies all conditions of the Trial Period Plan. SD 09-01, at 9.

- *Term Extension*: Second, if the Debt-to-Income ("DTI") remains above 31 percent at a two percent interest rate, extend the remaining term of the loan up to a maximum of 480 months from the Modification Effective Date ("MED"), to the extent allowed by existing servicing agreements.27[27]

- *Principal Forbearance: Third, if the DTI remains above 31 percent after calculating the first two steps, shift the necessary amount of principal necessary to achieve 31 percent DTI to a non-interest bearing balloon payment.28*[28] *The amount of this balloon payment is termed the principal forbearance because the servicer forebears earning interest on this principal amount.*

42.     After five years, the interest rate on the modified loan may increase up to one percent per year until it reaches the lower of the pre-existing note rate or a market-based rate.

**D.     BOA Used Urban, SLS and others to Create the Modification Denial Enterprise and a Scheme Designed to Feign Compliance with HAMP while Permanently Modifying as Few Loans as Possible**

**1.     BOA decided it was more profitable to avoid HAMP modifications.**

43.     Under HAMP, the government incentivizes participating servicers by paying $1,000.00 for each HAMP modification. However, this incentive is countered by financial factors

---

27     For HAMP trial modifications, the Modification Effective Date "is the anticipated Modification Effective Date of the official loan modification. This is the first day of the month following the month when the last trial payment is due." U.S. Department of Treasury, HAMP Data Dictionary - 04/01/2013 Release, https://www. hmpadmin.com/portal/programs/docs/hamp_servicer/hampdatadictionary04012013.xls.

28     **Error! Main Document Only.**Effective January 28, 2010, the amount of principal forbearance required is limited to the greater of 30 percent of the unpaid principal balance or an amount that would result in a mark-to-market LTV of 100 percent. U.S. Department of Treasury, *Making Home Affordable, Supplemental Directive 10-01*, Jan. 28, 2010 ("SD 10-01"), at 6. The balloon payment is due at the earlier of (i) the maturity of the loan, (ii) transfer of the property, or (iii) payoff of interest-bearing unpaid principal balance. SD 09-01, at 10.

that make it more profitable for BOA to avoid modification and to continue to keep a mortgage in a state of default or distress and to push loans toward foreclosure. This is especially true in cases where the mortgage is owned by a third-party investor and is merely serviced by BOA because BOA does not carry a significant risk of loss in the event of foreclosure.

44.    Economic factors that discourage BOA from meeting its obligations under HAMP by facilitating loan modifications include the following:[29]

- BOA may be required to repurchase loans from the investor in order to permanently modify the loan. This presents a substantial cost and loss of revenue that can be avoided by keeping the loan in a state of temporary modification or lingering default.

- The monthly service fee that BOA, as the servicer collects as to each loan it services in a pool of loans, is calculated as a fixed percentage of the unpaid principal balance of the loans in the pool. Consequently, modifying a loan to reduce the principal balance results in a lower monthly fee to the servicer.

- Fees that BOA charges borrowers that are in default constitute a significant source of revenue. Aside from income BOA receives directly, late fees and "process management fees" are often added to the principal loan amount thereby increasing the unpaid balance in a pool of loans and increasing the amount of the servicer's monthly service fee.

- Entering into a permanent modification will often delay a servicer's ability to recover advances it is required to make to investors of the unpaid principal and interest payment of a non-performing loan. The servicer's right to recover expenses from an investor in a loan

---

[29]    See Thompson, Diane E., Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior, National Consumer Law Center (October 2009).

~ 18 ~

modification, rather than a foreclosure, is often less clear and less generous.

- Fixed overhead costs involved in successfully performing loan modifications involve up-front costs to the servicer for additional staffing, physical infrastructure, and expenses such as property valuation, credit reports and financing costs.

45.    Former BOA employees have confirmed that BOA pressured them as a matter of policy to delay HAMP modifications in order to maximize fees for BOA. According to Simone Gordon, a former BOA Senior Collector of Loss Mitigation, BOA supervisors, known as "site leaders," regularly told the employees and "team leaders" they supervised that the more they delayed the HAMP modification process, the more fees BOA would collect. Employees were regularly drilled that it was their job to maximize fees for BOA by fostering and extending delay of the HAMP modification process by any means they could – this included by lying to customers.

46.    Another former BOA employee, William Wilson, who worked as an underwriter and was promoted to supervise a team of "Case Relationship Managers," testified that BOA fostered HAMP delays in order to push homeowners into in-house modifications that were more profitable for BOA. This former supervisor testified that BOA underwriters, Case Relationship Managers, and other employees were instructed by their respective supervisors to delay requests for HAMP modifications and then to push homeowners to accept an internal refinance so that Bank of America would profit. Once an applicant was finally rejected after a long delay, the bank would offer them an in-house alternative. Bank of America would charge a higher interest rate, ranging up to 5%, as compared to the 2% if the loan had been modified under HAMP.

47.    BOA knew that these procedures were contrary to the HAMP requirements to which it promised to adhere as a condition of accepting $45 billion in taxpayer bailout money. It also knew that its procedures were contrary to the representations made to borrowers, including representations in the Trial Period Plans sent to borrowers.

**2.    BOA, Urban, SLS and others fraudulently delayed and denied HAMP loan modifications.**

48.    Former BOA and Urban employees have confirmed that BOA is not complying with HAMP in a manner that can only be considered deliberate. BOA's general practice and culture is to string homeowners along with no intention of providing actual and permanent modifications. Instead, BOA has put processes in place that are designed to foster delay, mislead homeowners and avoid modifying mortgage loans.

49.    Former BOA and Urban employees recount that their supervisors instructed them to lie to customers and claim that BOA had not received documents it had requested, and that it had not received trial payments (when in fact it had). For example, former employee Simone Gordon and her co-workers were repeatedly told by their supervisors that admitting that BOA received documents would "open a can of worms" since BOA was required to underwrite the loan modification within 30 days of receiving those documents, and it did not have sufficient underwriting staff to complete the underwriting in that time. Former BOA underwriter and supervisor William Wilson confirmed that BOA underwriters had a backlog of files so large that they could not possibly complete underwriting within 30 or even 100 days of receiving a package of documents from any given homeowner. A former high-level BOA executive has described BOA's underwriters as being grossly overloaded to the point that they could not have been expected to perform effective or accurate underwriting.

~ 20 ~

50.     Steven Cupples is a former BOA underwriter who started with Countrywide in 2006 and was retained as a BOA employee when BOA bought Countrywide. BOA later promoted him to supervise a team of BOA underwriters. Mr. Cupples was among the first BOA employees to work on HAMP-related modifications and worked on the program in several different capacities including underwriting, data analysis, and internal quality assurance. Mr. Cupples has testified that it was clear that BOA had not dedicated even the most basic levels of staff and resources it knew it would need to keep up with the volume of HAMP loan modifications. BOA executives including Rebecca Mairone, John Berens, and Patricia Feltch were repeatedly made aware of some of the most obvious shortcomings in BOA's processes and performance. According to Mr. Cupples, despite BOA's executives having full knowledge of these problems, BOA made no substantial efforts to fulfill its obligations under HAMP in anything that could be described as a good-faith or honest effort.

51.     Former BOA employees located in customer service centers all over the country including Simone Gordon who worked in New Jersey, William Wilson who worked in North Carolina, Theresa Terrelonge and Erika Brown who worked in Texas confirmed reports from thousands of homeowners seeking modifications under HAMP: customer service representatives regularly informed homeowners that modification documents were not received on time or not received at all when, in fact, all documents had been received. Similarly, homeowners were regularly told that documents were sent on a particular date when, in fact, BOA had not sent the documents at all. Former Urban employees including Gregory Mackler and Bert Sheeks confirmed that Urban employees disseminated similar misinformation to homeowners who thought they were speaking to BOA's "Office of the President" when, in fact, they were speaking to Urban employees. The named plaintiffs in these matters were subjected to redundant,

~ 21 ~

ambiguous and threatening demands for documents by BOA and Urban – documents that BOA and Urban knew had already been submitted, that were not required to determine eligibility under HAMP guidelines, or that were unnecessary "updates" of previous documents.

52.     BOA Site Leaders specifically ordered their employees to hold financial documents borrowers submitted for at least thirty days. Urban employees including Gregory Mackler, a former Customer Advocate who was promoted to a position of Quality Control, and Bert Sheeks, a former document auditor, similarly described how Urban would let documents from borrowers sit and age without acting on them – all with the full knowledge of the BOA executives who were supervising Urban. Once thirty days passed, BOA would consider many of these documents, such as pay stubs or bank statements to be "stale" and the homeowner would have to re-apply for a modification.

53.     Former BOA supervisor and longtime employee Steven Cupples testified to discovering a method Urban employed to allow BOA to prevent modifications that consisted of "scattering" homeowner documents. Among other things, BOA tasked Urban with uploading financial documents it received from homeowners into computer systems that BOA underwriters could then review. Mr. Cupples recognized that Urban regularly scanned portions of document packages it received into *different* links in *various* computer systems such that the documents could not be viewed using a single system. Consequently, it would appear to an inadequately trained underwriter, or to an outside regulator conducting an audit, that the borrower had not sent a complete packet of required documents. BOA used this pretext to decline loan modifications to homeowners who had sent all documents required of them.

54.    After BOA and Urban had let homeowners' documents sit for a month or more, BOA would order that case managers and underwriters "clean out" the backlog of HAMP applications by denying any file in which the financial documents were more than 60 days old. BOA termed this cleanout a "blitz," and performed it approximately twice a month. According to former BOA supervisor Wilson, during a blitz, a single "team" of 10-15 Case Relationship Managers would decline between 600 and 1,500 modification files at a time for no reason other than that the borrower documents were more than 60 days old. BOA instructed its managers, underwriters and other employees to enter a reason into its electronic databases that would justify declining the modification it declined during a "blitz" to the Treasury Department. Justifications commonly included claiming that the homeowner had failed to return requested documents or had failed to make payments. In reality, these justifications were untrue and the justifications were entered with BOA's full knowledge that they were false. Former employee Theresa Terrelonge has confirmed that BOA did not properly employ the "waterfall" formula mandated by HAMP. According to a former high-level BOA executive, BOA staffed various positions with people who did not have the expertise or experience to properly perform their job duties. BOA also did not give its employees sufficient training to properly perform duties such as calculating an applicant's income for purposes of HAMP, properly applying the "waterfall" formula, or properly underwriting a loan file.

55.    Former BOA employees including Theresa Terrelonge and Simone Gordon testified to seeing homeowners' financial records manipulated in BOA's computer system to the homeowners' detriment. Former Urban employees including Bert Sheeks similarly recount employees manipulating financial records in the computer systems Urban shared with BOA in

~ 23 ~

order to justify ending the modification process and closing files more quickly.

56.    BOA offered production goals to managers and to employees based on how many files they could "close" – meaning how many homeowners seeking loan modifications they could decline. BOA awarded employees incentives such as $25 in cash or restaurant gift cards based on the number of files they could close in a given week. On the other hand, employees who did not close a sufficient number of files were subject to discipline and possible termination. BOA placed similar production goals and requirements on Urban. Former employees including Gregory Mackler and Bert Sheeks have described the intense pressure BOA placed on Urban and that Urban supervisors placed on employees to close files as fast as possible.

57.    Bank of America methodically carried out delay and rejection programs under the supervision of regional Vice Presidents and other executives including but not limited to Rebecca Mairone, John Berens, Kenneth Scheller, Troy Novotny, Patricia Feltch, and Tyrone Wells. The purpose of the mass denials was to reduce the volume of pending modification requests as quickly as possible while extending as few permanent modifications as possible.

### 3.    BOA assigned key HAMP functions to third parties such as Urban, SLS and others.

58.    In order to appear to be compliant with HAMP, BOA contracted with third parties to provide HAMP-related services. BOA controlled and closely supervised these third parties, one of which was Defendant Urban Settlement Services (aka Urban Lending Solutions, hereinafter "Urban").

~ 24 ~

59.    BOA identified Urban as a participant and member of an enterprise whose purpose was to create a phony front whereby BOA would offer borrowers the opportunity to receive a HAMP modification and thereby induce their response, but then reject a HAMP modification based on fraudulent pretenses of a homeowner's non-compliance.

60.    Thus, within weeks of committing to modify mortgages under HAMP by entering into an agreement with the Treasury Department, BOA contracted with Urban whereby BOA assigned to Urban key functions required to modify mortgage loans under the HAMP process.

61.    BOA assigned Urban specific tasks, and structured the arrangement so that BOA received daily, or even hourly, updates on everything Urban was doing with regard to HAMP. Urban and BOA interacted in a close relationship over which BOA maintained strict and meticulous control. BOA created this close contractual relationship in order to ensure that Urban would participate in the loan-modification scheme and work with BOA in an enterprise that has a common goal of reducing the number of HAMP modifications issued to borrowers.

62.    Among other things, BOA assigned Urban, SLS and others to analyze the data in a "pool" of loans to determine the preferred modification program based on BOA criteria and perform quality control on the data. Using BOA's criteria, Urban was to decide which modification program was appropriate." Often, this involved shifting a borrower who applied for a HAMP modification into a less advantageous, internal, BOA modification that would be more profitable for BOA.

63.    Urban, SLS and others were to receive, track, and perform quality control on financial documents sent by customers. It was to upload the documents to a web-based share-point site where it could be viewed by BOA.

~ 25 ~

64. Urban, SLS and others were to field telephonic inquiries from BOA customers regarding the status of their loan modifications and strive to answer the customers' questions. BOA also assigned Urban the task of proactively notifying homeowners when required documents were missing. To carry out the goal of the enterprise, BOA created scripts that Urban, SLS and others was to use for the calls.

65. Former Urban employees and a former BOA executive have confirmed that BOA demanded, and Urban provided, constant updates on virtually all aspects of work Urban performed.

66. Urban, SLS and others was paid based on the volume of loan files it processed. It was irrelevant to Urban's compensation whether it performed quality services to BOA borrowers, or actually succeeded in permanently modifying borrowers' mortgages.

67. With each loan modification package that contained a Trial Period Plan, BOA directed borrowers to return signed Trial Period Plans and to send financial documents back to BOA. The address to which borrowers were directed to send documents, however, was Urban's, SLS's and others facilities. Similarly, borrowers were directed to send documents by fax and were given Urban's, SLS's and others fax numbers. Borrowers were falsely led to believe they were communicating with BOA.

68. However, BOA, Urban, SLS and others actively concealed the nature of their relationships. When answering calls from customers, Urban, SLS and others employees identified themselves as being from BOA – typically from the "Office of the President." Urban employees were given titles and email addresses suggesting that they were employed by Bank of America. To the outside world of homeowners and regulators, Urban's workforce appeared to be

~ 26 ~

employees and executives of Bank of America. Borrowers were under the false impression that they were speaking to and corresponding with BOA when, in fact, they were interacting with Urban employees.

69.     Urban, SLS and others only entered the documents months after they had been sent, only scanned in partial documents and, in many cases, did not post the documents at all.

70.     Urban, SLS and others scanned and entered documents into multiple computer systems and scattered over various links in the systems such that a particular homeowner's application packet would appear incomplete to a regulator or auditor reviewing the file.

71.     Both BOA, Urban, SLS and others' employees reported the problems in the HAMP modification process on multiple occasions to BOA and Urban executives including Tyrone Wells, Troy Novotny, Kenneth Scheller, Robert Nicholson, Rebecca Mairone, David Swain, Patricia Feltch, Jinja Martin, and John Beranich. These were the executives and employees designated by BOA and Urban to oversee BOA and Urban's HAMP loan-modification efforts. Urban's performance did not improve and there were no efforts by BOA to change Urban's conduct or performance. Similarly, there were no substantial efforts by BOA to bring its own performance into compliance with reasonable business practices or to remediate the harm its failings caused hundreds of thousands of its customers. Both BOA and Urban continued on the same path, despite having full knowledge that it meant borrowers would be wrongfully denied, or delayed in getting, permanent modifications.

**4.    BOA directed and encouraged Urban, SLS and others to fraudulently deny loan modifications.**

72.    By secretly directing borrowers to return documents to Urban's, SLS's and others' locations, BOA used Urban, SLS and others as a repository for borrower documents. In actual practice, and according to former Urban employees including Gregory Mackler and Bert Sheeks, along with former BOA supervisors Steven Cupples and William Wilson, BOA designed Urban to serve as a "black-hole" for the documents borrowers sent in the course of trying to obtain permanent loan modifications. The manner in which BOA set up and directed Urban's, SLS's and others' processes guaranteed that the vast majority of Trial Period Plan Agreements would not be converted to permanent modifications in the time contemplated by the Trial Period Plan Agreements and by HAMP.

73.    Under BOA's scheme, loan modification packages were not forwarded to its underwriters until the borrower had submitted all required documents and the modification package was deemed "complete."

74.    At BOA's direction, Urban, SLS and others delayed forwarding modification packages to underwriting for months and instead noted on the computer system that documents were incomplete despite the fact that borrowers had provided all required documents. Customers regularly heard nothing from BOA for months after sending in their documents and making their required trial payments. When borrowers finally called to inquire as to the status of their modification, they were falsely strung along and told their loan was in process. Eventually most borrowers were falsely told that their file remained incomplete and that they were required to send in additional documents. Typically communications were over the phone, and were

~ 28 ~

knowingly and intentionally deceptive in light of BOA and Urban's, SLS's and others' overall loan-modification scheme.

75.    Among the documents borrowers sent Urban, SLS and others, thinking that these were being sent to BOA, were bank statements, income statements, and W-2 forms that were provided to verify income. BOA required that such documents were less than 90 (and sometimes 60) days old in order to support a permanent modification. If a document such as a bank statement was dated more than 90 days previous, BOA would not accept the document for purposes of underwriting the modification and the loan file would be deemed "incomplete." As part of the scheme, Urban, SLS and others customarily allowed the documents to "age" – meaning that it would not properly upload the documents until after the period by which they could be used for underwriting purposes. BOA consequently deemed the documents to be unacceptable and deemed the file to be incomplete, and refused to provide a permanent modification to the borrower. Again, as part of the scheme, this decision was not announced to the borrower for months – often more than a year after the borrower received their Trial Period Plan.

76.    The delay built into this system additionally allowed BOA and Urban, SLS and others to provide another basis for denial: "excessive forbearance." Pursuant to Trial Period Plans, borrowers were instructed to make "temporary" payments pending a permanent modification. These amounts were by definition lower than the payments due under their un-modified mortgages. However, during these "temporary" periods, and while pursuing its "black hole" delay strategy, BOA continued to consider the full, unmodified loan payments to be due from each borrower. Borrowers who were paying the modified amount stated in their Trial Period Plan agreements for months were

~ 29 ~

being charged the unmodified monthly amounts due. BOA would increase the borrower's indebtedness by the difference each month. Eventually, the borrower's level of outstanding debt would rise to a point that crossed a threshold and BOA would decline the loan modification due to "excessive forbearance."

77.    Thus, the overwhelming majority of homeowners who sought permanent modifications from BOA pursuant to HAMP were placed into a delay loop where they were falsely told via the wire or mail that their documents had not been received even if they had been and, if their documents were acknowledged, they were told they were too old and thus had to be resubmitted.

78.    This scheme was successful. BOA and Urban, SLS and others fraudulently denied permanent modifications to tens of thousands of borrowers who had fulfilled the requirements of their Trial Period Plans.

79.    The breadth and depth of this scheme is further illustrated by how BOA and Urban addressed complaints of homeowners and, in particular, homeowners who had pursued their complaints to the highest levels.

80.    Inquiries and complaints from borrowers that were escalated to within two levels of the CEO were recorded as "service requests." By the third quarter of 2010, BOA had between 20,000 and 25,000 service requests from borrowers that had not yet been resolved, and the number was constantly growing.

81.    In approximately August 2010, BOA instituted a program it called the "drive for five." The purpose of this program was to reduce the number of outstanding service requests to less than five thousand over a period of three months.

~ 30 ~

82.    Pursuant to their scheme and common plan BOA provided Urban, SLS and others with lists of service requests that needed to be closed on a daily basis. These lists consisted of hundreds or thousands of inquiries from homeowners regarding their home mortgages, including inquiries as to why they had not yet received a permanent modification despite complying with the terms of the Trial Period Plan. Urban, SLS and others' employees were required, at least in theory, to investigate the inquiry, investigate the underlying mortgage, and provide a recommendation as to the course of action. If follow-up work needed to be done with the homeowner, the service request was still considered to be outstanding. Alternatively, if the borrower could be determined to have failed the modification process, the service request could be deemed closed and the number of outstanding service requests would have been reduced.

83.    Urban, SLS and others' employees were instructed, at BOA's direction and with BOA's full knowledge, to close service requests in a manner that would reduce the number of outstanding requests as quickly as possible. Individual Urban, SLS and others' employees were expected to close dozens of files per day. Both BOA, Urban, SLS and others knew, and intended, that this would result in the false and deceptive denial of HAMP loan modifications to borrowers who were eligible to receive them.

84.    It was not feasible to reduce the service requests at the pace BOA demanded while thoroughly researching the borrower's file to confirm that documents had been sent or that the customer was indeed entitled to a permanent modification. Urban employees could, however, reduce service requests at the pace BOA demanded by closing files and thereby deeming borrowers to have failed the HAMP modification process.

85.    According to former Urban employees including Gregory Mackler, Urban hired hundreds of new employees – many with no qualifications and little training, in an effort to reduce the number of outstanding service requests. Urban employees were shown formulaic methods by which to close service requests. These methods included closing a service request (and therefore ending the HAMP process for the borrower) based on a "Missing Information Letter" or "Incomplete Information Notice" directed to the borrower in the electronic file. Bert Sheeks has testified that Urban employees were encouraged to close files simply by seeing such a notice in the electronic system without researching whether the notice was accurate or whether the borrower responded to the notice. Urban employees have confirmed that files were routinely closed on a fraudulent basis when it was apparent from the electronic records that the borrower had provided all required information and documents.

### 5.    BOA, Urban, SLS and others' executives knew loan modifications were being fraudulently denied and encouraged the fraud to continue.

86.    Executives at BOA, Urban, SLS and others' were fully aware that thousands of borrowers were being wrongfully denied HAMP modifications pursuant to the loan-modification scheme, yet they allowed, encouraged, and directed that the loan-modification scheme should continue unabated.

87.    John Beranich was an Urban vice president who oversaw efforts to comply with BOA's demand to reduce the number of service requests. Several former Urban employees including Gregory Mackler, Elizabeth Farmer, Shane Stahl, and Wesley White informed Beranich that Urban was regularly closing borrower files wrongfully and detailed the ways in which files were being wrongfully closed. Beranich responded by reminding employees who complained that their job was

to reduce the number of service requests and that failure to do so could lead to them losing their jobs. On multiple occasions, employees who raised these types of concerns to Beranich were either fired or demoted.

88.    Urban employees who raised concerns to Beranich regarding the propriety of the manner in which service requests were closed were subject to discipline that included demotion or even termination.

89.    Robert ("Robbie") Nicholson is a BOA executive who oversaw Urban's efforts to reduce service requests. According to former Urban employee Bert Sheeks, Nicholson was aware of the details of the manner in which Urban improperly closed service requests and that homeowners were being denied modifications and even losing their homes as a result. Nicholson did nothing to remedy these concerns. Instead, Nicholson personally confronted Urban employees who raised concerns and put pressure on the supervisors of those employees to bring them "in line."

90.    Ken Scheller is a BOA Vice President and former executive of Countrywide. Scheller was instrumental in creating and implementing BOA's policies and procedures to process HAMP applications. On multiple occasions, BOA and Urban employees directly informed Scheller that the processes were being administered in a manner that made it impossible for the vast majority of BOA customers to obtain permanent HAMP modifications. Scheller responded by telling at least one Urban employee who was raising concerns that BOA was "not of course interested" in faithfully reviewing modification requests. Scheller directed the employee to "back off" the issue, since raising concerns of this kind was inconsistent with BOA's and therefore Urban's core efforts to decrease HAMP participation.

91.     Rebecca Mairone was a BOA Vice President and a former COO of Countrywide's Full Spectrum Lending division. Mairone was instrumental in creating and implementing BOA's policies and procedures to process HAMP applications, including the extent to which BOA used Urban, SLS and others to implement its HAMP scheme. On multiple occasions, BOA employees and other executives directly informed Mairone that processes and training were inadequate, that error rates were unacceptable, and that, as a result, BOA customers who should have received HAMP modifications were being wrongfully declined and were instead losing their homes. Despite repeated reports, Mairone did not implement remedial measures that could reasonably be expected to be effective, thereby allowing the loan-modification scheme to continue unabated.

92.     David Swain is a BOA Vice President who oversaw BOA's efforts to reduce its backlog of HAMP applications and outstanding trial plans. Swain instituted high pressure initiatives to reduce backlog by declining HAMP applications and trial plans en masse.

93.     According to a former high-level BOA executive, Swain was repeatedly informed from various sources – both verbally and in writing, that reviews and audits showed that BOA's "blitzes" and other mass declination programs were resulting in thousands of homeowners being wrongfully denied HAMP modifications. Swain nevertheless continued with the same projects.

94.     Patricia Feltch is a BOA Vice President and former Countrywide executive. Feltch was instrumental in implementing BOA's policies and procedures to process HAMP applications. On multiple occasions, BOA employees and other executives directly informed Feltch that processes and training were inadequate, that error rates were unacceptable, and that, BOA customers were being wrongfully denied the opportunity to modify their mortgage loans and were instead losing their homes. Feltch was also instrumental in imposing Blitzes and other mass decline efforts. She

~ 34 ~

continued to impose and implement efforts geared to mass declinations despite being specifically informed that thousands of homeowners were being wrongfully denied HAMP modifications as a result.

96.    Nicholson, along with their immediate superiors Tony Meola and John Berens, constituted a control group who designed and implemented BOA's HAMP policies and procedures in a way that deliberately worked to defraud homeowners and to extend as few HAMP modifications as possible while still giving the appearance that BOA was making efforts to comply with HAMP.

**6.    Notices provided by BOA, Urban, SLS and others were fraudulent.**

97.    Defendants knew and intended that they had created a "black hole" for homeowners seeking HAMP modifications, and that the overwhelming majority of applicants would never receive permanent HAMP modifications.

98.    Defendants knew and intended that, as a result of their scheme to delay and wrongfully deny modifications, BOA would not provide permanent modifications under the terms of these contracts to all borrowers who satisfied their obligations. Defendants also knew and intended that the vast majority of borrowers who sought HAMP modifications, including those who received trial-payment agreements and satisfied their obligations, would instead be fraudulently denied a permanent modification on a falsified basis, or offered a permanent modification that did not comply with the terms of the contract.

99.    BOA, Urban, SLS and others knew and intended that Plaintiffs and other borrowers would rely on BOA's representations that BOA would provide a permanent modification on the terms offered, and Plaintiffs and other borrowers did in fact rely on the fact that BOA had promised

~ 35 ~

them permanent modifications upon fulfillment of the Trial Period Plan Agreement. Plaintiffs and other borrowers paid reduced payments, provided documents and incurred the costs of providing those documents, and forewent other means of addressing their difficulties in paying their mortgages.

100.    BOA, Urban, SLS and others sent documents to, and made false statements to, homeowners by means of interstate commerce, including but not limited the mails, telephone lines, email, and the internet. Such communications included letters instructing homeowners as to how to apply for HAMP modification; phone calls in which BOA and Urban employees knowingly misrepresented both the nature of the HAMP modification process and the status of borrowers' loan-modification applications; notices claiming that information or documents were missing; trial-payment; agreements; and notices of denial. Each of these documents were either fraudulent in themselves or sent with an intent to further the enterprise's loan-modification scheme. In the aggregate, Defendants used interstate mail and wire hundreds of thousands (and possibly millions) of times in their loan-modification scheme to make representations that they knew, or would have known but for their recklessness, were deceptive, false, and fraudulent.

101.    BOA contracted with other contractors to further its loan modification scheme. These contractors include Sykes Enterprises, Inc. ("Sykes"), who BOA retained to field telephone calls from customers attempting to secure HAMP modifications. The contractors also included Stewart Settlement Services ("Stewart") who BOA retained to mail documents to homeowners seeking HAMP modifications and to receive, compile, and upload documents from homeowners. As with Urban, BOA has closely controlled Sykes' and Stewart's work and performance.

### E.    BOA's Actions Caused Injury to Plaintiffs

102.    Plaintiffs have suffered injury caused by the scheme, including but not limited to longer loan payoff times, improper negative reporting to credit bureaus resulting in monetary harm due to damaged credit, monetary damages from higher principal balances, inappropriate fees and charges assessed to them, including broker price opinion fees, inspection fees, attorney's fees, "process management" fees, late fees and other charges associated with delinquency and default, increased accrued interest, and wrongful foreclosure. Further, in many instances, BOA actually encouraged or instructed borrowers to default on their loans in order to "qualify" for assistance, when in fact HAMP requires only that an "imminent risk of default" be attested to. In addition, by complying with the terms of their Trial Period Plans and making lower payments, borrowers have placed themselves at risk of being considered in default, and losing their homes in foreclosure, because they have not made their full mortgage payments.

103.    Moreover, whenever BOA delays the tender of a Trial Period Plan or a permanent HAMP modification, the terms of such a modification are less beneficial to the homeowner than they otherwise would be had BOA properly performed. If a class member has accepted a modification on terms that are less favorable than those of a HAMP-compliant modification offered at the close of their trial period, their injury is measured by the difference between the modification they accepted and the modification they were entitled to. If an eligible homeowner has not been tendered a permanent modification, their injury is measured by the difference between their current circumstances and the terms of the modification that they were entitled to – a difference that includes the wrongful loss of a property interest for those who have suffered foreclosure.

104.    Despite the HAMP directives regarding the specific manner in which homeowners in the process of applying for a modification or in a Trial Period Plan are to be reported to credit reporting agencies, a former employee reports that BOA's practice is to report homeowners to credit reporting agencies as being delinquent without any further explanation thereby further damaging the homeowners' credit and therefore making alternative options to resolve delinquencies, such as refinancing, difficult or impossible. Similarly, other forms of credit can and do become more expensive.

**F.     BOA Has Been Recognized as the Single Worst Performing Servicer under HAMP**

105.    Treasury publishes monthly and quarterly reports evaluating the performance of the MHA programs, including HAMP, and the performance of the servicers participating in those programs.[30] These performance reports have shown that BOA routinely failed to modify the loans of struggling homeowners in a timely manner. For example, Treasury withheld BOA's incentive payments related to decision-making timeliness based on its failure to comply with HAMP benchmarks through September 2011.[31]

---

30    Treasury's "Making Home Affordable Program Performance Reports" are available at http://www.treasury.gov/initiatives/financial-stability/reports/Pages/Making-Home-Affordable-Program-Performance-Report.aspx.

31    **Error! Main Document Only.**U.S. Department of Treasury, *Making Home Affordable Program Performance Report through April 2011* (June 9, 2011), at 19; U.S. Department of Treasury, *Making Home Affordable Program Performance Report through July 2011* (Sept. 1, 2011), at 21; U.S. Department of Treasury, *Making Home Affordable Program Performance Report through October 2011* (Dec. 7, 2011), at 21.

Treasury's quarterly servicer reporting shows that between 22 percent and 67 percent of BOA's active Trial Period Plans remained unresolved for six months or longer as of each end-of-quarter date from December 2010 to December 2012.[32] BOA's performance in this measure among the ten largest servicers was the fourth-worst as of December 2010, third-worst as of March 2011, and second-worst as of June 2011.[33]

106.     BOA's relative performance did not improve; it was rated the worst among the large service providers in each quarter from September 2011 to December 2012.[34] Treasury also evaluates each servicer's performance in internal controls and in identifying and contacting homeowners. Each servicer receives one of three ratings for each performance metric: (1) "did not meet benchmark; substantial improvement needed," (2) "did not meet benchmark; moderate improvement needed," and (3) "met benchmark; minor improvement may be indicated."[35]

---

32     U.S. Department of Treasury, Making Home Affordable Program Performance Report through April 2011 (June 9, 2011), at 20, 37; U.S. Department of Treasury, Making Home Affordable Program Performance Report through January 2012 (Mar. 2, 2012), at 24, 39; U.S. Department of Treasury, Making Home Affordable Program Performance Report through October 2012 (Dec. 7, 2012), at 26, 43; U.S. Department of Treasury, Making Home Affordable Program Performance Report through January 2013 (Mar. 8, 2013), at 26, 43.

33     U.S. Department of Treasury, Making Home Affordable Program Performance Report through April 2011 (June 9, 2011), at 18-36; U.S. Department of Treasury, Making Home Affordable Program Performance Report through January 2012 (Mar. 2, 2012), at 22-38.

34     U.S. Department of Treasury, Making Home Affordable Program Performance Report through January 2012 (Mar. 2, 2012), at 22-38; U.S. Department of Treasury, Making Home Affordable Program Performance Report through October 2012 (Dec. 7, 2012), at 26-42; U.S. Department of Treasury, Making Home Affordable Program Performance Report through January 2013 (Mar. 8, 2013), at 25-42.

35     **Error! Main Document Only.***See, e.g.*, U.S. Department of Treasury, *Making Home Affordable Program Performance Report through January 2013* (Mar. 8, 2013), at 19.

~ 39 ~

Treasury concluded that BOA did not meet benchmarks and required "substantial" improvement in HAMP compliance and program results in the quarters ending March 2011 and June 2011, and "moderate" improvement in each quarter from September 2011 to December 2012.[36] BOA's performance has thus been found to require improvement in HAMP compliance and program results in every quarter from March 2011 (when Treasury began reporting its assessment of servicer compliance) to December 2012.

107.    BOA executives internally recognized that its performance was grossly below the benchmarks Treasury expected and below the performance that would be expected in normal business practice. For example, Treasury expected servicers to reach a decision as to whether to extend a Trial Period Plan within 30 days of receiving financial documents from the applicant at a rate of 95% of all applications. BOA executives including Rebecca Mairone, Patricia Feltch, Ken Scheller, and David Swain internally recognized that its rate was approximately 60%, but did little or nothing to correct this shortcoming.

108.    BOA executives recognized that the errors it made in deciding to decline applications for loan modifications were at rates that it would have considered unacceptable in any of its regular lines of business. BOA normally considers error rates above 2% to be unacceptable in its regular business practices. BOA's internal audits showed that it erroneously declined applications for HAMP

---

36    **Error! Main Document Only.**U.S. Department of Treasury, *Making Home Affordable Program Performance Report through April 2011* (June 9, 2011), at 19; U.S. Department of Treasury, *Making Home Affordable Program Performance Report through July 2011* (Sept. 1, 2011), at 21; U.S. Department of Treasury, *Making Home Affordable Program Performance Report through October 2011* (Dec. 7, 2011), at 21; U.S. Department of Treasury, *Making Home Affordable Program Performance Report through January 2012* (Mar. 2, 2012), at 23; U.S. Department of Treasury, *Making Home Affordable Program Performance Report through April 2012* (Apr. 19, 2012), at 26; U.S. Department of Treasury, *Making Home Affordable Program Performance Report through July 2012* (Sept. 13, 2012), at 26; U.S. Department of Treasury, *Making Home Affordable Program Performance Report through October 2012* (Dec. 7, 2012), at 25; U.S. Department of Treasury, *Making Home Affordable Program Performance Report through January 2013* (Mar. 8, 2013), at 25.

modifications at rates that exceeded 25%. The negative ratings BOA received from Treasury were deserved and were likely understated.

## V.    CLAIMS OF NAMED PLAINTIFFS

### A.    Barbara Gibbs and Melvin Gibbs-Squires

109.    Plaintiffs Barbara Gibbs and Melvin Gibbs-Squires purchased their homes in Florence, South Carolina in March of 2005, and Gaithersburg, Maryland in December 2006. They financed the building of their South Carolina home with a one year construction loan:    purchase with a 30-year fixed mortgage from BOA. The loan had a fixed rate of 6.125% and called for monthly payments of $2,009.42. Mr. and Mrs. Gibbs lived in the home [South Carolina] that secured their mortgage as their primary residence. They made all of their mortgage payments in full and on time.

110.    In June 2005, Mrs. Gibbs retired at the age of 62. Mrs. Gibbs' income was reduced by more than 40% – from approximately $105,000 to approximately $60,000 per year. During this period Mr. Gibbs had an income of about $24,000 per year. In or about September 2005, the Department of Labor restored Mr. Gibbs' disability payments: about $36,000 per year; raising Mr. Gibbs' yearly income to about $60,000 per year. However, in or about February of 2009 the Department of Labor penalized Mr. Gibbs about $1,500 per year for two (2) years.

111.    In or about May of 2008, the Gibbs' applied to BOA for loan modifications. BOA approved the modified loans, but only if the Gibbs' paid closing cost of about $30,000. The Gibbs' declined the modified loans. The small reduction in monthly payments would not have allowed the Gibbs to recover the $30,000 over the course of the loan.

~ 41 ~

112.    On March 6, 2009 via BOA's electronic account contact system, Mrs. Gibbs again complained the $200 application fees ($400.00), the closing fees of $30,000, and the poor treatment of the Gibbs, especially since Mr. Gibbs was a Veteran.

113.    In or about September 2009, Mr. Gibbs heard about the MHA and HAMP programs on the news. He gathered information about the program, and inquired from BOA, by and through their employees, the process of applying for a loan modification under HAMP through Bank of America. BOA's employees were misleading and deceptive, and gave Mr. Gibbs the impression that Gibbs' loans were not covered under the HAMP program(s). These statements by BOA employees were intentionally false and misleading at the time.

114.    The Gibbs continued to contact Bank of America over several months in an effort to request that they be considered for a loan modification under HAMP and were continually given incorrect information or transferred from one employee to another.

115.    On or about July 2011, Gibbs sent BOA a proposal to settle all possible claims arising out of BOA's improper conduct.

116.    On September 26, 2011, the Gibbs spoke with Rogelio Chua, their first BOA assigned customer relationship manager ("CRM"), who requested the Gibbs submit documents (9 pages) to complete the HAMP application process. On September 28, the Gibbs faxed the completed application along with all the documents requested including a completed and signed Hardship Affidavit, bank statements, pay stubs, their most recent tax return, utility bills, and a completed IRS Form 4506T. As directed, the Gibbs faxed these documents to "Bank of America" to the number provided by Mr. Chua.

~ 42 ~

117.    On November 11, 2011, Gibbs notified BOA that Mr. Gibbs' cancer surgery and treatment was being conducted at Johns Hopkins Hospital, Baltimore, Maryland, and Mr. Gibbs would be using the property known as: 20105 Torrey Pond Place, Gaithersburg, Maryland 20886, as Mr. Gibbs' primary residence.

118.    When the Gibbs called and inquired about the status of their application, they were repeatedly told that Mr. Chua was "out sick," "on vacation," "no longer employed," or otherwise "unavailable." They left dozens of messages that were not returned. These misleading and deceptive phone conversations were part of Defendants' overall loan-modification scheme, and are typical of what thousands of other borrowers also experienced.

119.    Over the next several months, the Gibbs contacted Mr. Chua at least 1-2 times each week to inquire as to the status of their application. They were repeatedly told, in telephone communications, that their application was "under review" and that they could expect a decision from BOA. These communications were knowingly and intentionally false, and were part and parcel of Defendants' use of the wires to perpetuate a scheme of deception and fraud involving thousands of borrowers like the Gibbs.

120.    The Gibbs was told on at least one occasion that all their documents had been lost and that they would need to re-send them Mr. Hector Prieto. They were also instructed to re-send particular documents they had previously sent. This false and knowing misrepresentation that Defendants had not received, or had "lost," the Gibbs' documents was precisely the sort of misrepresentation Defendants intended to be issued to thousands of borrowers like the Gibbs, by use of the mails and wires.

121.    On February 03, 2012 and again on July 18, 2012, Gibbs notified Mr. Prieto that Rogelio Chua, CRM was responsible for Gibbs' application. Gibbs also informed Mr. Prieto that Gibbs had been provided no information or incorrect information, and Gibbs had raised the issue of Mrs. Gibbs being "steered" into a predatory loan.

122.    On June 20, 2012, the Gibbs received a letter stating they were not eligible for failure to submit the required documents. The letter also suggested that to avoid foreclosure the Gibbs should consider a Short Sale or Deed in Lieu of Foreclosure. The Gibbs were instructed to re-submit all documents yet again. This knowing, intentional, and deceptive attempt to push the Gibbs out of a HAMP modification, and to require the Gibbs to once again send in documents they had previously sent on multiple occasions, was made pursuant to Defendants' loan-modification scheme and enterprise and was typical of communications made to thousands of other borrowers.

123.    The Gibbs fully complied with each demand that they send in documents and promptly sent the documents BOA requested – even when they had already sent the same documents multiple times.

124.    On February 5, 2012, Gibbs sent Mr. Chua a fax requesting the status of their application, complained of the predatory loan Mrs. Gibbs had been steered into, and attempt to charge the Gibbs $30,000 in settlement fees.

125.    On August 1, 2012 and August 20, 2012, the Gibbs faxed Mr. Chua complaining of the attempts of Mr. Prieto to deny the Gibbs application. Gibbs also informed Mr. Chua that the deliberate delays by BOA was not acceptable.

~ 44 ~

126.    On August 22, 2012, BOA sent Gibbs a letter thanking Gibbs for their patience and assured Gibbs BOA would research Gibbs' case and resolve the issues.

127.    From September 2011 to November, 2012, BOA assigned 2 CRMs to the Gibbs' modification. The vast majority of the Gibbs' attempts to obtain information regarding the status of their modification went unanswered.

128.    On Monday, November 5, 2012 – two and one half months after Bank of America had thanked the Gibbs for their patience and BOA assured Gibbs they would research the case – the Gibbs received a letter informing them that their mortgages had been sold to Nationstar Mortgage and SLS, and that [i]t would no longer be serviced by Bank of America.

129.    The Gibbs learned that Bank of America had transferred their loan without reflecting any modification information and/or negotiations. AND, BOA deliberately "shelled" Gibbs' November 2011 mortgage payment and showed the Gibbs had defaulted on the South Carolina loan. According to Nationstar, the loan is over $13,334.84 in arrears due to yet more interest, fees and costs that HAMP-less Gang added to the loan principal. *The Gibbs is at risk of foreclosure despite never having missed a payment on their mortgage*.

130.    As a result of the enterprise that Defendants created, the Gibbs have not completed the modification process over the past four years; a process that should have taken four months, and they now owe thousands of dollars more on their mortgage.

131.    Defendants repeatedly used mail and wire to issue knowingly false communications to the Gibbs regarding their loan modification and the status of the loan modification, just as Defendants did with thousands of other borrowers pursuant to their loan-modification scheme.

~ 45 ~

**PROFFER:**

132.    When certified as an intervenor, Plaintiff Gradey Smith will re-plead and allege he purchased his home in Stone Mountain, Georgia (1991), after retiring as a Second Grade Detective: NYCPD. He financed the mortgage with a mortgage loan BOA. Mr. Smith lived with his wife in the home that secured their mortgage as their primary residence.

133.    In or about July 2011, Mr. Smith heard about the MHA and the HAMP program. He called BOA, and asked to be considered for a loan modification under HAMP. Mr. Smith was told over the telephone by a BOA representative that the necessary documents would follow by mail.

134.    Instead of documents regarding a modification, Mr. Smith's mortgage was sold.

135.    When certified as an intervenor, Plaintiff Patricia Jackson-Kelly will re-plead and allege she purchased his home in Los Angeles, while working as a nurse (Lt. Colonel), Veterans Hospital. She financed the mortgage with a mortgage loan BOA. Ms. Jackson-Kelley lived in the home that secured their mortgage as her primary residence.

136.    In or about September 2010, Ms. Jackson-Kelly heard about the MHA and the HAMP program. She called BOA, and asked to be considered for a loan modification under HAMP. Ms. Jackson-Kelly was told over the telephone by a BOA representative that she could not be considered. After months of attempting to negotiate a resolution under MHA and HAMP programs, a BOA representative convinced Ms. Jackson-Kelly, her only option was a Short Sale.

137.    Ms. Jackson-Kelly lost her home without having an opportunity to apply for the assistance needed.

~ 46 ~

138.    Defendants either failed to send instructions or sent instructions to Gibbs, and similar instructions to thousands of other homeowners, knowing and intending that the instructions would induce Gibbs and other homeowners to act. At the time these instructions and other documents regarding HAMP modifications were sent to Gibbs and thousands of other homeowners, Defendants also knew and intended that pursuant to their loan-modification scheme, Defendants were actively denying HAMP modifications en masse and for false reasons. Thus, these instructions were misleading and deceptive when they were given.

## VI.    CLASS ACTION ALLEGATIONS

139.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

140.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) on their own behalf and on the behalf of all other members of the classes described below.

### A.    National RICO Class and State Classes

141.    Plaintiffs seek certification of a national class consisting of all individuals whose home mortgage loans have been serviced by BOA and who, since April 13, 2009, (1) applied to BOA for a HAMP loan modification, (2) the HAMP-less Gang failed and neglected to provide proper information regarding MHA and HAMP, and (3) sent documents to, or received documents or other communications from, HAMP-less Gang in connection with their attempts to modify their home mortgage.

142.    Excluded from the National RICO Class and the state classes are individuals who are included in the class sought to be certified in the litigation styled as: In re Bank of America Home Affordable Modification Program Contract Litig., Case No. 1:10-md-02193-RWZ. That Class is

~ 47 ~

limited to borrowers who fulfilled a Trial Period Plan Agreement that was provided pursuant to Treasury Directive SD-09 (form 3156).

143.    The Named Plaintiffs in the National RICO Class and the state classes sue on their own behalf and on behalf of classes of persons under Rules 23(b)(2) and 23(c)(4) of the Federal Rules of Civil Procedure.

144.    Plaintiffs do not know the exact size or identities of the National RICO Class or the state classes, since such information is in the exclusive control of Defendant. Plaintiffs believe that the National RICO Class and each of the state classes encompass many thousands of individuals and whose identities can be readily ascertained from Defendants' books and records. Therefore, the National RICO Class and the state classes are so numerous that joinder of all members is impracticable.

145.    All members of the National RICO Class have been subject to and affected by the same conduct. The claims are based on uniform loan modification processing requirements and evidence of a coordinated and concerted effort to frustrate and upend HAMP. There are questions of law and fact that are common to the National RICO Class, and predominate over any questions affecting only individual members of the class. These questions include, but are not limited to the following:

        a.    the existence of the enterprise designed to minimize the number of permanent modifications that BOA would extend to borrowers under HAMP;

        b.    the nature and scope of the enterprise;

        c.    whether Defendants' issuance of HAMP solicitation letters and letters of instruction were fraudulent due to processes they put in place to guarantee that no more than a small

~ 48 ~

minority of HAMP modifications would ever be fulfilled;

        d.    whether Defendants' information and instructions that were publicly made available via the internet were fraudulent due to processes they put in place to guarantee that no more than a small minority of HAMP modifications would ever be fulfilled;

        e.    whether Defendants' issuance of Trial Period Plan Agreements and other trial-payment agreements were fraudulent due to processes they put in place to guarantee that no more than a small minority of HAMP modifications would ever be fulfilled;

        f.    whether Defendants' enterprise perpetrated a fraudulent scheme on homeowners applying for assistance promised under HAMP;

        g.    whether Defendants' enterprise perpetrated fraud by deliberately delaying the process of underwriting applications for modifications from customers;

        h.    whether information and notices issued to borrowers that fostered delay and claimed that documents were missing constituted fraud; and

        i.    whether the Classes are entitled to damages.

146.    All members of the state classes have been subject to and affected by the same conduct. The claims are based on similar or identical failure of the application process and/or failure to be granted a Trial Period Plan, and therefore there are questions of law and fact that are common to the state classes, which predominate over any questions affecting only individual members of the classes.

147.    The claims of the Plaintiffs are typical of the claims of the National RICO Class and the state classes and do not conflict with the interests of any other members of the classes.

~ 49 ~

148.     The named Plaintiffs will fairly and adequately represent the interests of the National RICO Class and the state classes. They are committed to the vigorous prosecution of the class claims and will retain attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection and RICO actions.

149.     A class action is superior to other methods for the fast and efficient adjudication of this controversy. A class action regarding the issues in this case does not create any problems of manageability.

150.     This putative class action meets the requirements of Fed. R. Civ. P. 23(b)(3) for issues of liability.

## VII. EQUITABLE TOLLING, DISCOVERY RULE RE: STATUTES OF LIMITATIONS

151.     Any applicable statutes of limitations have been tolled by Defendants' illegal, deceptive, and fraudulent practices. Defendants have concealed from Plaintiffs and the Classes the truth about their illegal, deceptive, and fraudulent practices described herein, thereby tolling the running of any applicable statutes of limitations.

152.     Plaintiffs and the classes had no knowledge and could not have reasonably discovered Defendants' illegal, deceptive, and fraudulent practices as alleged herein until recently.

153.     Defendants are estopped from relying on any statute of limitations defense because of their illegal, deceptive, and fraudulent practices as alleged herein.

## VIII. COUNTS

## COUNT I

## BY THE NATIONAL RICO CLASS

Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(C)

154.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

155.    From at least May 6, 2009, to the present, the affiliation between members of the HAMP-less Gang constituted an enterprise. Defendants conducted and participated in that enterprise's affairs through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (c).

156.    The RICO enterprise, which engaged in, and whose activities affected interstate and foreign commerce, was comprised of an association-in-fact of entities and individuals that included Bank of America, N.A., and its subsidiary BAC Home Loans Servicing, LP, Urban Settlement Services, LLC, Nationstar Mortgage, LLC and SLS along with several of their respective employees and officers, including John Beranich, Robbie Nicholson, Ken Scheller, Patricia Feltch, Rebecca Mairone, David Swain, and Jinja Martin.

157.    The members of the RICO enterprise all had a common purpose: to extend as few permanent HAMP modifications as possible while providing BOA a justification to claim that borrowers had not fulfilled their trial-payment agreements or were otherwise ineligible for HAMP modifications. At BOA's direction and with BOA's full knowledge, HAMP-less Gang instructed its employees to close borrowers' claim modification files without an adequate investigation, thereby deeming the borrowers to have failed the HAMP modification process, even when it was apparent

~ 51 ~

from the electronic records that the borrower had provided all required information and documents. BOA and Urban executives were not only informed that the files were closed without a sufficient investigation, but actively encouraged or cajoled HAMP-less Gang employees to do so.

158.    The enterprise was also forged by the relationships among those associated with it. BOA contracted with HAMP-less Gang members and assigned to it the key aspects of the process of administering trial plans and providing permanent modifications to borrows who fulfilled the terms of their trial plans. Through their respective employees, HAMP-less Gang coordinated their activities to frustrate the HAMP process and limit the number of homeowners who obtained permanent loan modifications, while maintaining the appearance of compliance to regulators and the public. For example, BOA directed that HAMP-less Gang employees identify themselves as being from Bank of America – typically from the "Office of the President." HAMP-less Gang employees were given titles and email addresses suggesting that they were employed by Bank of America to create the false impression to borrowers that they were speaking to and corresponding with BOA when, in fact, they were interacting with HAMP-less Gang employees. BOA set up and directed Urban's processes in a manner that guaranteed that the vast majority of HAMP applicants would not obtain permanent HAMP modifications. As part of the scheme to defraud, HAMP-less Gang became a "black hole" for documents sent the homeowners by, for example, allowing the documents to "age" so that they would not support a permanent modification. For its part, BOA would deny modifications, claiming that the information (which was residing with HAMP-less Gang) had not been received.

159.    This RICO enterprise has remained in existence for several years, enabling its members to pursue the enterprise's purpose. HAMP-less Gang conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that began in 2009 and

continues through the present and has consisted of hundreds of thousands (or millions) of acts of mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343.

160.    HAMP-less Gang engaged in a scheme or artifice to defraud borrowers by stalling and hindering the loan modification process and misleading the borrowers to prevent many of the homeowners who are eligible for permanent loan modifications and who have met the requirements for participation in HAMP from receiving the loan modifications to which they are entitled.

161.    HAMP-less Gang were aware of this scheme and actively participated in it by, for example, misrepresenting HAMP-less Gang employees as BOA employees and by establishing delaying tactics that would guarantee that as few borrowers as possible would receive their loan modifications.

162.    The U.S. mail or wire services, including internet, telephone and email were used in furtherance of the scheme. Use of the mail or wire services were either known to HAMP-less Gang or it was reasonably foreseeable that they would be used for this purpose.

163.    Defendants' repeated violations of the federal mail and wire fraud statutes, which have all occurred in the last few years, include:

a.    Providing instructions over the internet as to the steps a homeowner would need to take to secure a permanent loan modification under HAMP with the knowledge and intent that it would induce homeowners to act in expectation, even though Defendants did not intend to follow the steps stated on their website that would enable homeowners who fulfilled all requirements to obtain a permanent HAMP loan modification.

b.    Sending instructions to Plaintiffs and other homeowners by mail, fax, email or internet directing them to provide documents and other information to be considered for a HAMP

~ 53 ~

loan modification, with the knowledge and intent that it would induce homeowners to act in expectation, even though Defendants did not intend to enable homeowners who fulfilled all requirements to obtain a permanent HAMP loan modification.

      c.     Informing thousands of homeowners by mail, fax, telephone and/or email that their applications were on hold, or that they would not receive a permanent modification, because they had not provided necessary financial documents, when in fact Defendants knew that the homeowners had provided the documents.

      d.     Informing thousands of homeowners by mail, fax, telephone and/or email that their applications were on hold, or that they would not receive a permanent modification, because their financial information was not timely, even though Defendants knew that the documents were timely when the homeowners provided them.

      e.     Intentionally providing thousands of homeowners who applied for HAMP loan modifications, and who were qualified to receive HAMP modifications, with in-house loan modifications that were less advantageous to homeowners but more profitable to BOA.

164.    The scheme to defraud that was perpetrated by BOA and Urban and their employees and which was at the center of the racketeering activity, involved issuing trial-payment agreements to thousands of eligible applicants, when BOA intended to deny the vast majority of those agreements on entirely false grounds.

165.    As part of and in furtherance of the scheme to defraud, HAMP-less Gang would receive documents and information by mail, fax, telephone and/or email from homeowners fulfilling their Trial Period Plan Agreements and intentionally delay acting on the documents for several months.

166.    As part of and in furtherance of the scheme to defraud, HAMP-less Gang would receive documents and information by mail, fax, telephone and/or email from homeowners and intentionally fail to record receipt of the documents on electronic systems or to convey the modification package to underwriting for months and often not until the documents had aged beyond the point that they could be used for underwriting.

167.    As part and in furtherance of the scheme to defraud, Urban and BOA intentionally manipulated and falsified data on customers' electronic files so that files could be closed and modification applications rejected.

168.    As part of and in furtherance of the scheme to defraud, HAMP-less Gang would send borrowers' notices by mail, fax, telephone and/or email that information or documentation was missing from the homeowners' modification files when Urban and BOA knew that the homeowners had provided the information.

169.    As part of and in furtherance of the scheme to defraud, HAMP-less Gang regularly sent customers notices of denial by mail, fax, telephone and/or email that HAMP-less Gang knew to be based on reasons that were untrue.

170.    As part of and in furtherance of the scheme to defraud, HAMP-less Gang employees falsely held themselves out to BOA customers and to the public by mail, fax, telephone and/or email as being employees and executives of BOA and gave homeowners the false impression that they were speaking to and corresponding with BOA executives from the "Office of the President."

171.    These thousands of violations constitute a pattern of racketeering. They are related in that they share the same purpose of defrauding homeowners; involve the same participants, victims, and methods of commission. And because defendants' large-scale criminal activities occurred over a

~ 55 ~

period of several years and are continuing unabated, they amount to or pose a threat of continued criminal activity.

172.    Each of the defendants associated with the RICO enterprise knew of existence of the enterprise and its related activities. BOA, through its designated officers and employees, devised the loan-modification scheme and coordinated with Urban to carry it out. Individual defendants oversaw, directed, and managed various aspects of the scheme, including authorizing HAMP-less Gang employees to employ unscrupulous methods to reduce the number of borrowers who would be granted loan modifications and reprimanding those employees who objected.

173.    HAMP-less Gang and their employees conducted and participated in the affairs of the RICO enterprise through a pattern of racketeering activity. Each of the defendants participated in the enterprise's decision-making or were plainly integral to carrying out the scheme to defraud. Specifically, BOA through its employees, including Scheller, Mairone, Nicholson, Martin, Feltch, and Swain, set up the process for approving the loan modifications to ensure that the vast majority of applications would not result in permanent modifications in the time contemplated by HAMP. BOA and its officers and employees, including Nicholson and Scheller, supervised Urban and coordinated with Urban and its officers and employees, including Beranich, to ensure that the processes were carried out according to plan.

174.    As part of their participation, HAMP-less Gang knowingly and intentionally sent, mailed, and transmitted or caused to be sent, mailed, or transmitted fraudulent solicitations, instructions, and Trial Period Plan Agreements in interstate or foreign commerce. These fraudulent documents constituted numerous and repeated violations of the federal mail and wire fraud statutes in violation of 18 U.S.C. §§ 1341, 1343, as well as a pattern of racketeering activity in violation of

~ 56 ~

18 U.S.C. §§ 1961 (1), 1962 (c). Defendants knew, or at a minimum were reckless in not knowing, that the documents were misleading, deceptive, and/or false when sent, as a result of the actions of their officers and employees pursuant to the loan-modification scheme outlined in this Complaint.

175.   In addition, HAMP-less Gang sent, mailed and transmitted or caused to be sent mailed or transmitted, in interstate or foreign commerce, notices containing false and fraudulent information pertaining to the status of borrowers' efforts to obtain a permanent loan modification under HAMP to Plaintiffs and to thousands of members of the National RICO Class. These fraudulent notices constituted numerous and repeated violations of the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, as well as a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961(1), 1962 (c). By reason of their conduct and participation in the racketeering activity, Defendants caused damages to Plaintiffs and to members of the National RICO Class.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs respectfully request the following relief:

A.     Certify this case as a class action and appoint the named Plaintiffs to be class representatives for each class for which they are designated and their counsel of choice to be class counsel;

B.     Enter a judgment declaring the acts and practices of BOA complained of herein to constitute fraud, together with an award of monetary damages and other available relief on those claims;

C.     Grant a permanent or final injunction enjoining BOA's and/or HAMP-less Gang, their agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiffs and the members of the Classes;

~ 57 ~

D.    Order BOA to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties under HAMP;

E.    Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees;

F.    Award Plaintiffs an amount to be proven at trial, but not less than One-Hundred Million ($100 Million) Dollars;

G.    Treble damages and the cost of the suit, including attorneys' fees, pursuant to 18 U.S.C. § 1964(c);

H.    Plaintiffs demand trial by jury on all issues permitted by law; and

I.    Grant Plaintiffs and the Classes such other and further relief as this Court deems just and proper.

Respectfully Submitted,


Barbara A. Gibbs, Pro-se


Melvin E. Gibbs-Squires, Pro-se


Dated: October 28, 2013
Florence, SC

~ 58 ~